UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LUIS LUGO QUIJANO,

                    Plaintiff,

              - against -

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-3363 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Luis Lugo Quijano brings this action under 42 U.S.C. § 1383(c), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Supplemental Security Income ("SSI").  (Dkt. 1.)  The Commissioner has moved for judgment on the pleadings. (Dkt. 26.)  Plaintiff did not file a motion for judgment on the pleadings.  For the reasons set forth below, the Court grants Defendant's motion.

## BACKGROUND

### I.     Factual and Procedural Background

Plaintiff has a history of physical and mental health issues, including a history of substance abuse.  Plaintiff moved to New York City from Puerto Rico in 2008, and at the time of filing the Complaint in July 2020, was living in a homeless shelter.  (Complaint ("Compl."), Dkt 1, ¶ 25.) While Plaintiff has sought medical care for both his mental and physical symptoms for many years, Plaintiff generally seeks care at hospital emergency departments across New York City.  (*Id.* ¶ 22.) In addition to mental and physical impairments, Plaintiff alleges that Plaintiff suffers from cognitive impairments.  (Tr. 382, 1563;[1] Compl. ¶ 16.)

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

1

On August 17, 2018, Plaintiff protectively filed for SSI, claiming that he had been disabled since June 29, 2018, due to schizophrenia, attention deficit hyperactivity disorder (ADHD), bipolar disorder, panic attacks, arthritis, plantar fasciitis, a dislocated left shoulder, a herniated disc, a bulging disc, a pinched nerve, bunions, migraines, and substance abuse. (Tr. 15, 590.) In connection with his SSI application, Plaintiff met with two consultative examiners on October 23, 2018. Dr. Rebecca Cohen, a psychologist, conducted a psychiatric evaluation. (Tr. 848–52.) Dr. Cohen diagnosed Plaintiff with bipolar disorder, panic disorder, and substance use disorder of marijuana. (Tr. 851.) Regarding the limitations caused by Plaintiff's mental impairments, Dr. Cohen opined that Plaintiff had "no limitations" in his abilities to "understand, remember, or apply simple directions and instructions," or "maintain personal hygiene and appropriate attire." (*Id.*) Plaintiff had "mild limitations" in his abilities to understand, remember, or apply complex directions and instructions; use reason and judgment to make work-related decisions; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; and be aware of normal hazards and taking appropriate precautions. (*Id.*) Dr. Cohen found that Plaintiff had moderate limitations in his abilities to "regulate emotions, control behavior, and maintain well-being." (*Id.*) Dr. Cohen concluded that "[t]he results of the examination appear[ed] to be consistent with psychiatric and substance abuse problems, but in itself, this [did] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (*Id.*)

Dr. Ram Ravi, an internist, conducted a physical evaluation on October 23, 2018. (Tr. 854–56.) Plaintiff reported bilateral hand pain, back pain, left shoulder pain, and bilateral foot pain. (Tr. 854.) Dr. Ravi diagnosed Plaintiff with all of these impairments, however, he concluded

2

that Plaintiff had "[n]o limitations sitting, standing, bending, pushing, pulling, lifting, and carrying." (Tr. 856.)

Following the consultative examinations, Plaintiff's medical record and the consultative opinions were sent to two non-examining Department of Disability Services ("DDS") consultants. On October 29, 2018, Dr. "A. Vinluan," an internist,[2] opined that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and stand/walk/sit for six hours in an eight-hour workday, and was unlimited in his ability to push/pull. (Tr. 457.) Importantly, Dr. Vinluan provided a comprehensive list of medical evidence that he considered in formulating his opinion, which included multiple MRIs and x-rays taken from 2015 to 2018 and prior disability filings by Plaintiff. (Tr. 458.) On November 5, 2018, Dr. "S. Bhutwala," a psychologist,[3] concluded that Plaintiff was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; maintaining regular attendance; sustaining an ordinary routine; working with others; completing a normal workday and workweek without interruptions; interacting appropriately with the general public; accepting instructions and criticism from supervisors; getting along with coworkers; and maintaining socially appropriate behavior. (Tr. 459–61.) Both Drs. Vinluan and Bhutwala provided nearly one-and-a-half-page narratives supporting their conclusions. (Tr. 453–54, 460–61.) On November 6, 2018,

---

[2] Dr. A. Vinluan has Medical Specialty Code of "19" (Tr. 458), which corresponds to "Internal Medicine," *see* Program Operations Manual System (POMS) DI 24501.004 Medical Specialty Codes, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (last visited Mar. 29, 2022).

[3] Dr. S. Bhutwala has Medical Specialty Code of "38" (Tr. 461), which corresponds to "Psychology," *see* Program Operations Manual System (POMS) DI 24501.004 Medical Specialty Codes, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (last visited Mar. 29, 2022).

Plaintiff's claims for benefits were initially denied. (Tr. 15.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.*)

On February 4, 2019, Plaintiff met with his substance abuse counselor Joseph Belloir, MSN, PMHNP. (Tr. 1533–34.) Mr. Belloir noted that he had not examined Plaintiff since August 21, 2018. (Tr. 1534.) Mr. Belloir indicated that Plaintiff had been diagnosed with bipolar disorder (moderate), opioid use disorder (severe, in sustained remission), anxiety disorder (severe, in early remission), and cocaine use disorder (severe, in early remission). (Tr. 1533.) Mr. Belloir noted that Plaintiff "ha[d] good insight into his mental illness" and was "eager to continue his healing process." (Tr. 1534.) Mr. Belloir estimated that Plaintiff's ability to work was "good." (*Id.*)

On June 10, 2019, Plaintiff met with Dana Cohen, a vocational rehabilitation specialist, for a vocational assessment. (Tr. 1550–57.) Plaintiff performed a series of tests from June 10 to June 14, 2019 that measured his work-related skills. (Tr. 1556.) Ms. Cohen observed that Plaintiff "demonstrated the ability to work efficiently and maintain focus to complete assignment tasks." (Tr. 1551.) Ms. Cohen noted that Plaintiff had "excellent attendance" and was "punctual in the mornings and returned from breaks on time." (*Id.*) Ms. Cohen concluded that Plaintiff "seemed to tolerate the work demands (sedentary tasks) with no difficulty by working independently." (*Id.*)

On August 2, 2019, Plaintiff met with Nurse Practitioner ("NP") Lesly Curtis. (Tr. 1523– 30.) NP Curtis diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), depression, panic attack disorder, anxiety, insomnia, and claustrophobia, and provided a Global Assessment of Function ("GAF") score of 65.[4] (Tr. 1525–

---

[4] A GAF score of between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning," "but [is] generally functioning pretty well[] [and] has some meaningful personal relationships." *Dyjewska v. Colvin*, No. 15-CV-00532 (MAT), 2018 WL 703103, *2 (W.D.N.Y. Feb. 3, 2018)

26.)  NP Curtis observed that Plaintiff appeared "fidgety" and was anxious, but also that Plaintiff's insight and judgement were fair to good, and his thought process was logical and goal-directed. (Tr. 1525.)  NP Curtis noted that living in a homeless shelter was "a trigger for his anxiety and panic disorder," and that Plaintiff "needs his own place to live to be able to stabilize, continue education, socialize, and get to normal life."  (*Id.*)

On October 5, 2019, Plaintiff met with Dr. Emilian Mihaila, a psychologist, who provided a neuropsychological evaluation in connection with his application for vocational services.  (Tr. 1559–65.)  Dr. Mihaila observed Plaintiff's speech to be "pressured and mumbled" and noted that he "often look[ed] overly sedated."  (Tr. 1560.)  Following testing, Dr. Mihaila found Plaintiff had a reading ability equivalent to a 7.6[5] grade level, and an overall Intelligence Quotient ("IQ") of 67, which is "extremely low."  (Tr. 1562–63.)  Dr. Mihaila noted "difficulty with most areas including memory, verbal comprehension, processing speed and perceptual reasoning."  (Tr. 1562.)  Dr. Mihaila suggested that Plaintiff's medication regimen be "re-assessed," given that it appeared the medications "cause[d] drowsiness" and that he may be "incapacitated."  (*Id.*)

On February 3, 2020, ALJ Seth Grossman conducted a hearing on Plaintiff's claim.  (Tr. 367–429.)  Plaintiff appeared with his attorney Mackenzie Lew.  (*Id.*)  During the hearing, the ALJ called a medical expert, psychologist Dr. Laura Hopper, to resolve inconsistencies in the record. Dr. Hopper testified as to Plaintiff's mental impairments and cognitive functioning.  (Tr. 385–87, 400–12.)  While Dr. Hopper had not met with Plaintiff, she stated that she had reviewed the

---

(quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. rev. 2000)).

[5] A 7.6 reading level indicates an ability to "[a]nalyze how an author develops and contrasts the points of view of different characters or narrators in a text."  Common Core, *English Language Arts Standards*, http://www.corestandards.org/ELA-Literacy/RL/7/ (last visited Mar. 29, 2021).

medical record.  (Tr. 385.)  Dr. Hopper testified that she did not believe that Plaintiff's impairments met or equaled any of the criteria of a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (Tr. 401.)  Dr. Hopper noted that Plaintiff did have some limitations in terms of understanding complex information.  (*Id.*)  Regarding Dr. Mihaila's IQ test finding of 67 for Plaintiff, Dr. Hopper testified at great length to the issues with the testing.  (Tr. 407–12.)  First, Dr. Hopper testified that the score was "not consistent with [Plaintiff's] history of going through any type of schooling."  (Tr. 411.)  That is, Dr. Hopper questioned the validity of Plaintiff's purported IQ score of 67, *i.e.*, as being too low, based on Plaintiff having attended any school. Second, she stated that the "score pattern [was] not consistent with a genuine presentation of someone with a genuine disorder."  (Tr. 411–12.)  Finally, Dr. Hopper found the results "very questionable" in the absence of validity testing.[6]  Dr. Hopper concluded that even if the scores were valid, Plaintiff could still perform simple tasks but would require constant supervision.  (Tr. 403, 419.)  During the hearing, the ALJ also questioned a vocational expert ("VE").  (Tr. 416–25.)

By decision dated February 14, 2020, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from August 17, 2018, the filing date, through the date of the ALJ's decision.  (Tr. 15–25.)  Plaintiff requested a review of the ALJ's decision, which was denied by the Appeals Council on June 10, 2020.  (Tr. 1–3.)  Thereafter, Plaintiff timely commenced this action.[7]

---

[6] Dr. Hopper testified that "the person who conducted this evaluation did not do any validity testing to indicate whether or not these scores are valid scores, which is typically what one would do in a neuropsychological evaluation, particularly if somebody is claiming a disability." (Tr. 401.)

[7] 42 U.S.C. § 1383(c)(3) provides that "[t]he final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).  According to 42 U.S.C. § 405(g),

## II.     The ALJ's Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).[8]  First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the answer is yes, the plaintiff is not disabled.  *Id.*  If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment.  *Id.* § 416.920(a)(4)(ii).  An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities."  *Id.* § 416.922(a).  If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled.[9]  *Id.* § 416.920(a)(4)(ii).  But if the plaintiff does suffer from an impairment or

---

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary."  *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).  The final decision was issued June 10, 2020 (Tr. at 1), and the Complaint was filed on July 27, 2020 (Complaint, Dkt. 1), 43 days after the presumed receipt of the decision, rendering this appeal timely.

[8] Some cases cited below involve disability insurance benefits (DIB) regulations, while this case involves SSI, but the DIB and SSI regulations are "virtually identical."  *Hernandez v. Comm'r of Soc. Sec.*, No. 20-CV-5760 (PKC), 2022 WL 604005, at *2 n.5 (E.D.N.Y. Mar. 1, 2022).  The DIB regulations are found at 20 C.F.R. § 404.900 *et seq.*, while the parallel SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*

[9] In cases involving mental health, such as this one, a mental health impairment is severe when the Plaintiff has either one extreme or two marked limitations in a broad area of functioning, which include understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.  20 C.F.R. Part 404, Subpart P, App'x 1, § 12.04(B).  An "extreme limitation" is defined as the inability to

combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *Id.* § 416.920(a)(4)(iii); *see also id.* Pt. 404, Subpt. P, App'x 1. If the ALJ determines at step three that the plaintiff has one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act. *Id.* § 416.920(a)(4)(iii). On the other hand, if the plaintiff does not have a listed impairment, the ALJ must determine the plaintiff's residual functional capacity ("RFC") before continuing on to steps four and five. To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." *Id.* § 416.945(a)(1). The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work. *Id.* § 416.920(a)(4)(iv). If the answer is yes, the plaintiff is not disabled. *Id.* Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 416.920(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

Here, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 17, 2018, the application date. (Tr. 17.) At step two, the ALJ determined that Plaintiff had the following severe impairments: bursitis/tear in the left shoulder, Lumbar L5 stress fracture, schizoaffective disorder, unspecified anxiety disorder, cannabis use disorder, amphetamine use disorder, and opioid use disorder. (*Id.*) The ALJ determined that Plaintiff's other alleged impairments, including migraines, were not sufficiently severe as to satisfy the step

---

function independently, appropriately, or effectively, and on a sustained basis. *Id.* A "marked limitation" means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. *Id.*

two criteria.  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed impairments in the Listings.  (Tr. 18.)  The ALJ then determined Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform all levels of work (Exhibit B6F p. 1- 4) as defined in 20 CFR 416.967(b)[10] except he is limited to simple task work.  For simple task work[,] he can perform all necessary job functions, including, but not limited to, understanding and carrying out instructions, maintaining attention and concentration, appropriately interacting and relating to supervisors, coworkers and the public, and keeping a regular schedule, all within normal work expectations.  The limitation to simple task jobs is the outside limit of any impairment.  The claimant testified that he does off the books work as a sound engineer and that he has earned an associate[] degree in that field. The limitation to simple task job is warranted based upon some evidence of difficulties in concentration, and because the exact nature and the full extent of the claimant's off the books work is not at all clear.

(Tr. 19.)  At step four, the ALJ concluded that Plaintiff did not have past relevant work.  (Tr. 24.) Finally, at step five, the ALJ found that there were other jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as light housekeeping, marker, document preparer, and assembler.[11]  (*Id.*)  The ALJ thus concluded that the Plaintiff was not disabled.  (Tr. 25.)

---

[10] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

[11] The ALJ noted that "the jobs [he] rel[ies] upon for [the] decision . . . are light or sedentary."  (Tr. 23.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits.  42 U.S.C. § 405(g); 42 U.S.C. § 1383(c).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks and brackets omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (*per curiam*).

---

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

**DISCUSSION**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and fails to apply the relevant legal standards. (Compl. ¶¶ 26–35.) Specifically, Plaintiff argues that the ALJ incorrectly evaluated Plaintiff's impairments under § 12.05 of the Listings, provided an RFC that was not supported by substantial evidence, and relied on a mistake of fact related to Plaintiff's education level and past work experience. (*Id.*) The Commissioner argues that the ALJ's decision was based on substantial evidence and free of legal error. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def.'s Mem."), Dkt. 26-1, at 17.) For the reasons set forth below, the Court grants the Commissioner's motion.

**I.     The ALJ Adequately Developed the Record**

The Court notes that, even though Plaintiff did not raise the issue, the Court has an independent duty to ensure that the ALJ satisfied his duty to develop the record. *Hernandez v. Comm'r of Soc. Sec.*, No. 20-CV-5760 (PKC), 2022 WL 604005, at *4 (E.D.N.Y. Mar. 1, 2022); *Lebby v. Comm'r of Soc. Sec.*, No. 20-CV-4760 (PKC), 2022 WL 580983, at *4 (E.D.N.Y. Feb. 24, 2022) *Thomas v. Comm'r of Soc. Sec.*, No. 20-CV-5086 (PKC), 2022 WL 523544, at *4 (E.D.N.Y. Feb. 22, 2022); *Vargas v. Comm'r of Soc. Sec.*, No. 20-CV-4363 (PKC), 2022 WL 462392, at *5 (E.D.N.Y. Feb. 15, 2022); *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *10 (S.D.N.Y. Aug. 6, 2021) (collecting cases). It is particularly important for ALJs to adequately attempt to obtain opinions from treating physicians, *Hernandez*, 2022 WL 604005, at *4, and to obtain additional evidence where there are apparent ambiguities or contradictions in the record, *Skartados v. Comm'r of Soc. Sec.*, No. 20-CV-3909 (PKC), 2022 WL 409701, at *6 (E.D.N.Y. Feb. 10, 2022).

A "treating physician" is defined as a claimant's "own physician . . . who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and

physician-patient relationship with the individual." *Schisler v. Sullivan*, 3 F.3d 563, 569 (2d Cir. 1993); *Vargas*, 2022 WL 462392, at *6. Here, the ALJ did not obtain any opinions from any treating physicians. Based on this Court's review of the record, however, Plaintiff had no such physician from whom the ALJ was obligated to attempt to obtain an opinion. This appears to be because Plaintiff primarily sought care not through regular treatment, but in hospital emergency departments. (Compl., Dkt 1, ¶ 22); *see Vargas*, 2022 WL 462392, at *6 (doctor who treated plaintiff once in the emergency room was not a treating physician). While Plaintiff testified before the ALJ that Plaintiff had a psychiatrist named Oscar Ocasio (Tr. 393), Plaintiff's own counsel stated that counsel had reached out to Dr. Ocasio and learned that Plaintiff "[was] not Dr. Ocasio's patient and ha[d] never had a professional relationship with him." (Tr. 714.)

With respect to ambiguities or contradictions in the record, the Court notes that the medial record indicating that Plaintiff had an IQ of 67 (Tr. 1563) could appear to contradict other evidence in the record, such as Plaintiff's educational history (Tr. 32) and the medical opinions stating that Plaintiff had only mild to moderate limitations in only some areas of mental functioning (Tr. 851). When presented with these ambiguities, however, the ALJ did exactly what he should have done. Rather than wave away the apparent contradiction, *see Skartados*, 2022 WL 409701, at *6, the ALJ sought and obtained additional evidence to resolve the contradiction. Specifically, the ALJ obtained testimony from a medical expert on this exact issue (Tr. 385–87, 400–12), which the Court discusses in detail below.

Based on this Court's review of the record, the Court thus finds that the ALJ satisfied his duty to adequately develop the record.

## II.    The ALJ Correctly Evaluated Plaintiff's Impairments Under § 12.05 of the Listings

At step three, the claimant bears the burden of demonstrating that his impairments meet or are equal in severity to each of the medical criteria set forth in one of the listings. *See Claymore*

*v. Astrue*, 519 F. App'x 36, 37 (2d Cir. 2013) ("The claimant 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'" (quoting *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999))); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (noting that it is the plaintiff's "burden to demonstrate that [his] disability [meets] all of the specified medical criteria of a spinal disorder" (internal quotation marks omitted) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990))). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530; *Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 360 F. App'x 240, 243 (2d Cir. 2010) (affirming determination that the plaintiff was not disabled because "at no point [in the record] is there any documented medical determination that meets all of the required criteria of any given impairment under the Listing of Impairments" (citing *Sullivan*, 493 U.S. at 530)).

Here, while the ALJ does not specifically include an analysis of § 12.05 of the Listings in the decision, the Court finds that the ALJ correctly determined that Plaintiff did "not have an impairment or combination of impairments that meet[] or medically equal[] the severity of one of the listed impairments." (Tr. 18.) To satisfy § 12.05, a Plaintiff must show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05; *see Talavera*, 697 F.3d at 151. "'The required level of severity for this disorder is met when' the applicant has, '[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.'"[12]

_____

[12] The severity/IQ level required for each of § 12.05's subparts differ. For example, § 12.05(B) requires an IQ of less than 59, while § 12.05(C) requires an IQ between 60 and 70.

*Talavera*, 697 F.3d at 152.  Absent evidence to the contrary, courts will presume that an IQ test taken as an adult is reflective of one taken before the age of 22.  *Id.*  In addition to the IQ requirement, Plaintiff must show "deficits in adaptive function."  *Id.* at 153 ("[T]he regulations recognize that 'persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job,' and are therefore not disabled, if their adaptive functioning is sufficiently intact." (quoting *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007))).  "Adaptive functioning refers to an individual's 'ability to cope with the challenges of ordinary everyday life.'"  *Id.* at 153 (quoting *Novy*, 497 F.3d at 710).  Courts will look to the entire record, including evidence of daily functioning, education, and medical opinions, to determine whether a plaintiff's adaptive functioning is sufficiently intact.  *Id.* at 153–54.

Plaintiff fails to satisfy both parts required to meet § 12.05 of the Listings.  First, the ALJ was within his discretion to find that the results of the IQ test did "not appear consistent with the claimant's academic functioning."[13]  (Tr. 21.); *Burnette v. Colvin*, 564 Fed App'x 605, 608 (2d Cir. 2014) (finding that the ALJ properly exercised discretion in finding the IQ scores were inconsistent with the record).  Dr. Hopper's testimony during the ALJ hearing, mainly that the score was inconsistent "with [Plaintiff's] history of going through any type of schooling" and the lack of validity testing (Tr. 411–12), provided substantial evidence to support the conclusion that Plaintiff's IQ test score was invalid.

---

*Burnette v. Colvin*, 564 Fed App'x 605, 608 (2d Cir. 2014).  Given Plaintiff's IQ score of 67, the Court interprets the Complaint to refer to § 12.05(C).

[13] The Court notes that the ALJ mistakenly believed that Plaintiff had finished his associate degree, based on Plaintiff's testimony during the hearing, when in fact Plaintiff had only completed three semesters.  (Tr. 32).  The Court addresses this point more substantively below.

Second, even if the score was presumed to be valid, the Court finds the ALJ had substantial evidence to conclude that Plaintiff does not suffer from "deficits in adaptive function." *Talavera*, 697 F.3d at 153.  As discussed in greater length below, every medical and vocational expert in the record concluded that Plaintiff could perform either light or sedentary work.  Dr. Hopper, when asked to assume the IQ score was valid, testified that Plaintiff could still perform simple tasks but would likely require supervision.  (Tr. 403, 419.)  Dr. Cohen, a consultative psychologist, concluded that Plaintiff's impairments did "not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 851.)  Dr. Bhutwala, a non-examining psychologist, indicated that Plaintiff was capable of "unskilled work." (Tr. 461.)  Joseph Belloir, MSN, PMHNP, Plaintiff's substance abuse counselor, estimated Plaintiff's work ability to be "good." (Tr. 1534.)  Dana Cohen, a vocational rehabilitation specialist, concluded that Plaintiff "seemed to tolerate the work demands (sedentary tasks) with no difficulty by working independently." (Tr. 1551.)  In addition to these evaluations, Plaintiff's ability to complete three semesters of an associate degree, with a GPA of 3.22 (Tr. 32), is further support that Plaintiff does not suffer from adaptive functioning deficits, *Talavera*, 697 F.3d at 153.  In light of a potentially invalid IQ score and substantial evidence suggesting Plaintiff does not suffer from "deficits in adaptive function," the Court finds that the ALJ's decision at step three was supported by substantial evidence.  *Talavera*, 697 F.3d at 153–54.

## III.    The ALJ's RFC Finding Is Supported by Substantial Evidence

An ALJ's RFC determination must be supported by substantial evidence.  *Talavera*, 697 F.3d at 151.  As noted, "[s]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (internal quotation marks and brackets omitted) (quoting *Richardson*, 402 U.S. at 401). Medical records alone cannot provide substantial evidence for an RFC determination; an "ALJ's

15

RFC determination must be supported by a medical opinion in the record at that time." *Pearson v. Comm'r of Soc. Sec.*, No. 20-CV-3030 (AMD), 2021 WL 3373132, at *4 (E.D.N.Y. Aug. 3, 2021). In determining whether the Commissioner's findings were based on substantial evidence, the Court must ascertain that the agency considered all evidence in reaching its findings. 20 C.F.R. § 404.1520(a)(3). Moreover, and as previously noted, the Court "is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417. However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark*, 143 F.3d at 118. In any case, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki*, 729 F.3d at 175–76.

Here, the ALJ's analysis of Plaintiff's physical and mental impairments and the resulting RFC determination are supported by substantial evidence.

### A.    Physical Impairments

The ALJ considered the opinions of Dr. Ravi, a consultative examiner, and Dr. Vinluan, a non-examining medical expert. (Tr. 23.) The ALJ found Dr. Ravi's opinion—that Plaintiff had no exertional limitations (Tr. 856)—persuasive, because it was "consistent with the examination," and because the record lacked any evidence that would undermine the "completely normal physical examination," such as "consistent treatment for physical problems." (Tr. 23.) The ALJ found Dr. Vinluan's opinion "somewhat persuasive," as it was "confusing[] and unclear if it was for light work or no severe impairment." (*Id.*) While the lack of clarity in a consultative examiner's opinion may warrant remand in some instances, *see Skartados*, 2022 WL 409701, at *6–7, here, either interpretation of Dr. Vinluan's opinion supports the ALJ's finding that Plaintiff is capable of performing light work (Tr. 23). As the ALJ notes:

16

> [T]he jobs I rely upon for my decision, *supra*, are light or sedentary. The question as to whether the claimant has any physical limitations is non-outcome determinative, because there are sufficient sedentary jobs to result in an unfavorable decision (Document Preparer, D.O.T. 249.587-034, SVP2, 46,000 and Assembler, 735.687-034, SVP2, 40,000 jobs in the national economy). There is no substantial evidence that the claimant is physically unable to do sedentary work.

(*Id.*) The Court agrees that the record does not provide substantial evidence that Plaintiff cannot perform sedentary work. Absent contradictory medical opinions or evidence in the record, the Court finds that the ALJ's RFC is supported by substantial evidence. *Brogdon v. Berryhill*, No. 17-CV-7078 (BCM), 2019 WL 1510459, at *10 (S.D.N.Y. Mar. 22, 2019) ("If the opinion of a treating physician is either absent or deemed not controlling, the opinions of consultative examiners and state agency reviewers may provide substantial evidence to support an ALJ's RFC determination."). Here, there were no opinions from treating physicians because—as discussed above—Plaintiff did not have any regular treating physicians, and the opinions of Drs. Ravi and Vinluan, as well as the medical records, provide substantial evidence to support the ALJ's conclusion.

## B.    Mental Impairments

In addressing the limitations created by Plaintiff's mental impairments, the ALJ considered three medical opinions: those of Dr. Hopper, Dr. Bhutwala, and Dr. Cohen. (Tr. 22–23.) The ALJ determined that Dr. Hopper's opinion, provided at the ALJ hearing, was "mostly persuasive." (Tr. 22.) Dr. Hopper found mild to moderate limitations in several key areas of functioning, but concluded that Plaintiff was capable of "a simple task job." (*Id.*) The ALJ determined that non-examining expert Dr. Bhutwala's opinion was "somewhat persuasive," as Dr. Bhutwala never personally examined Plaintiff and did not have access to the entire medical record. (Tr. 23.) Dr. Bhutwala found that Plaintiff had no to moderate limitations in key functioning areas and provided a detailed narrative outlining the medical evidence considered. (Tr. 460–61.) Finally, the ALJ

determined that consultative examiner Dr. Cohen's opinion was persuasive and that "[t]he difference between [the ALJ's] findings and Dr. Cohen's are not significant." (Tr. 23.)  Dr. Cohen found "no limitations in Plaintiff's ability to understand, remember, or apply simple directions and instructions, and only mild limitations for complex directions and instructions."   (*Id.*) Additionally, Dr. Cohen indicated that "[t]he results of the examination appear to be consistent with psychiatric and substance abuse problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 851.)  In some cases, particularly mental health cases, opinions from one-time consultative examiners who did not have access to important medical records may be insufficient to provide substantial evidence to support an ALJ's decision.  *See Skartados*, 2022 WL 409701, at *9.  Here, however—as discussed above—there were no regular treating physicians to provide contrary opinions, and the consultants and consultative examiners had access to Plaintiff's extensive records.  Accordingly, the opinions of record provided substantial evidence to support the ALJ's RFC determination.  *See Brogdon*, 2019 WL 1510459, at *10.

In addition, in this case, the ALJ also considered other medical evidence that supported the medical opinions on record.  The ALJ noted, upon review of the extensive records from emergency departments, that "[t]reatment records in the [medical evidence record] essentially show that [Plaintiff's] condition stabilized with medication and treatment," and that most visits were a result of medication noncompliance.  (Tr. 20–21); *see Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) (summary order) (ALJ properly considered a statement that the claimant's medical condition had improved with treatment).  The ALJ also considered treatment records from Access-VR, the facility where Plaintiff received substance abuse counseling from Joseph Belloir, MSN, PMHNP, noting that Plaintiff displayed "fair to good" judgment and insight.  (Tr. 21.)  These records

provided further evidence to support the ALJ's RFC determination.  *See Suttles v. Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (finding that ALJ did not err by giving great weight to consultative examiner's opinion where it was consistent with record evidence).

Plaintiff argues that the ALJ mistakenly relied on factually incorrect testimony provided by Plaintiff during the ALJ hearing regarding his completion of an associate degree in sound engineering.  (Tr. 372–73; Compl. ¶¶ 28, 29, 34.)  Plaintiff argues that this is a ground for remand because the incorrect testimony was relied on both by Dr. Hopper in concluding that Plaintiff's IQ test was faulty and by the ALJ in reaching his RFC determination.  (Compl. ¶¶ 28, 29, 34.)  The Court finds that Plaintiff's arguments are not supported by the record.

For starters, although Plaintiff did not complete his associate degree, he had completed three semesters of study and achieved a GPA of 3.22.  (Tr. 31–32.)  And contrary to the Complaint in this matter, Dr. Hopper did not testify that Plaintiff's IQ test results "were [in]valid because Plaintiff had an associate degree" (Compl. ¶ 34), but rather that the results were "[in]consistent with [Plaintiff's] history of going through *any type of schooling*" (Tr. 411 (emphasis added)).  Given that Plaintiff had completed three semesters of course work toward an associate degree, Dr. Hopper's statement is not based on an incorrect premise or lacking evidentiary support.  Additionally, Dr. Hopper provided several other reasons that Plaintiff's IQ test results were "questionable," such as the lack of validity testing.  (Tr. 411–12.)  Though the ALJ did state that "the claimant's attaining an associate degree" was a factor he considered, the ALJ also listed several other factors that he considered, including the mental status evaluation and the medical opinions in the record.  (Tr. 18.)  As discussed above, the medical opinions and testimony from Drs. Hopper, Cohen, and Bhutwala were substantial evidence to support the RFC.  Because there was substantial evidence to support the ALJ's RFC determination, the ALJ's mistaken belief that

Plaintiff had completed his associate degree (versus completing three semesters of course work toward that degree) was harmless. *Henson v. Colvin*, 13-CV-5934 (NGG), 2016 WL 4288214, at *11 n.9 (E.D.N.Y. Aug. 15, 2016) ("Because the ALJ's mistaken belief did not affect his final determination of unemployment, the court finds the error to be harmless.").[14]

Based on the fact that all medical opinions on record are supportive of the RFC, and there is no other sufficiently contradictory evidence in the record, the ALJ's RFC is supported by substantial evidence. *Suttles*, 654 F. App'x at 46 (no error by district court in affirming ALJ denial of benefits based on opinions of consultative examiner supported by evidence in the record).

## CONCLUSION

For the reasons set forth herein, the Court grants Defendant's motion for judgment on the pleadings. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 30, 2022
       Brooklyn, New York

---

[14] Plaintiff also argues that the ALJ failed to develop the record by not allowing Plaintiff to submit his education transcripts. (Compl. ¶ 35.) Given the Court's conclusion that the ALJ had substantial evidence to reach the RFC absent the mistaken fact, the Court finds any such error to be harmless.